STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Patrick E. RICHTER, Defendant-Respondent-Cross Petitioner.

Supreme Court

*No. 98–1332–CR. Oral argument February 15, 2000.—Decided June 20, 2000.*

2000 WI 58

(Also reported in 612 N.W.2d 29.)

For the plaintiff-appellant-petitioner the cause was argued by *Eileen W. Pray*, assistant attorney gen-

eral, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-respondent-cross petitioner there were briefs and oral argument by *Susan E. Alesia*, assistant state public defender.

¶ 1. DIANE S. SYKES, J. This case involves a warrantless entry of a home, and the recurring question of whether the circumstances under which it took place were sufficiently exigent to justify it. The circumstances were these: a Marinette County sheriff's deputy responded to an early-morning dispatch of a burglary in progress at a trailer park. The victim flagged down the deputy as he arrived on the scene and told him that someone had broken into her mobile home, and that she had seen the intruder flee her trailer and enter the defendant's trailer across the street. The deputy observed signs of forced entry at the defendant's trailer—a window screen was knocked out and lying on the ground. The deputy shined his flashlight in the open window and attracted the attention of two people who were sleeping on the floor. They opened the door and identified the defendant, who was sleeping on the couch, as the owner of the trailer. The deputy entered the trailer, woke the defendant, told him what had happened and asked his permission to search the trailer for the burglary suspect. Permission was granted. During the search, the deputy observed marijuana in plain view, which the defendant admitted was his.

¶ 2. The defendant was charged with several marijuana possession offenses, and moved to suppress the physical evidence and his statements, alleging an illegal entry. The circuit court granted the motion, and

the court of appeals affirmed, finding the circumstances insufficiently exigent and the defendant's consent insufficiently attenuated to justify the search. *State v. Richter*, 224 Wis. 2d 814, 817, 592 N.W.2d 310 (Ct. App. 1999). Because we conclude the entry was justified by exigent circumstances—specifically, the deputy's "hot pursuit" of the burglary suspect and his need to protect the safety of those inside the trailer—we reverse. We also conclude that the court of appeals' application of the attenuation doctrine was based upon a misconstruction of several of the doctrine's elements.

¶ 3. The facts of the case are not in dispute. In the early morning hours of October 12, 1997, Marinette County Sheriff's Deputy Rick Berlin was on patrol in the City of Marinette. At approximately 4:30 a.m., Berlin overheard a City of Marinette police dispatch reporting a burglary in progress at the Golden Sands Trailer Park. Berlin, who was near the area, responded to the call. When he arrived at Golden Sands, he was immediately flagged down by Linda Champion, who reported that an unknown man had just broken into her mobile home on lot 438. She told the officer that she had yelled at the intruder, and he then ran from her trailer into the trailer on lot 439 directly across the street. Her husband confirmed this account.

¶ 4. Deputy Berlin went to the trailer on lot 439. The trailer had a front picture window just west of its front door. As he approached, Berlin noted that the window was open and its screen had been knocked out onto the ground outside. Since the temperature was in the 40s, Berlin took this as a sign of forced entry, given the information he had obtained from the Champions across the street.

Q. What was going through your mind at that time as far as what you were thinking when you saw that open window?

A. I believed whoever this male was ran to that trailer at 439 and broke into that trailer because the screen was laying on the sidewalk or the front porch.

Q. Did you have any concerns for the safety of whatever occupants may have been in that mobile home?

A. Yes, I did.

Q. What concerns did you have?

A. I felt that there could be possibly some endangerment there because this male did break into that trailer at 438 and then ran across and ran into the trailer at 439.

¶ 5. Berlin approached the open window and shined his flashlight into the darkened trailer. He saw at least three people sleeping in the front room—two on the floor and one man on the sofa directly across from the window. He tried waking the occupants by shining his flashlight on them and announcing, "Sheriff's Department, come to the door."

¶ 6. Two of the occupants, Nicholas Dufek and Debra Sable, woke up and came to the door. Berlin told them there had been a break-in at the home across the street and asked whether they had seen a man enter their trailer. Dufek and Sable said they had been sleeping and had not seen anyone enter. Berlin then asked permission to enter the home and search for the intruder. Dufek and Sable told Berlin that they did not own the trailer, but that the man sleeping on the sofa, Patrick Richter, did.

531

¶ 7. Berlin entered the trailer and woke Richter.[1] Berlin told Richter that someone had just broken into the trailer across the street and that a witness had seen the intruder flee into Richter's trailer. Berlin then asked if he could search Richter's home for the intruder. Richter replied, "[y]eah, that's cool." Upon entering the trailer, Berlin also noticed a fourth individual sleeping on the floor of the front room. Linda Champion and her husband later identified that man, Shawn McFadden, as the person who broke into their mobile home. McFadden was Richter's roommate at the time.

¶ 8. Having obtained Richter's consent, Berlin and City of Marinette Police Officer Scott Asplund, who also responded to the burglary dispatch and arrived at some point after Berlin, searched the trailer for the intruder. Berlin found a portable scale and a clear plastic bag containing marijuana in plain view on a nightstand in one of the bedrooms. In the bedroom closet, Berlin found a marijuana branch hanging from a hanger.

¶ 9. Berlin questioned Richter about the marijuana, and Richter admitted it was his. He consented to a pat-down search, and Berlin recovered a brass marijuana pipe from his front pants pocket. Berlin placed Richter under arrest. Later that day, during a search pursuant to a warrant, officers found more marijuana and another scale in Richter's trailer and garage.

¶ 10. Richter was charged with one count of manufacture of a controlled substance (THC), contrary to

---

[1] There is some confusion in the record as to who woke Richter. Berlin testified that he did. However, his sworn search warrant application, which was apparently received into the suppression hearing record by stipulation, says Dufek and Sable did. The circuit court found that Berlin woke Richter.

Wis. Stat. §§ 961.41(1)(h)1 and 961.14(4)(t) (1995–96);[2] one count of possession of THC contrary to Wis. Stat. §§ 961.14(4)(t) and 961.41(3g)(e); and one count of possession of drug paraphernalia contrary to Wis. Stat. § 961.573(1). The charges were later upgraded to allege repeater status (second offense). *See* Wis. Stat. § 961.48.

¶ 11. Richter moved to suppress the physical evidence and his statements, alleging an illegal entry and search. A suppression hearing was held on January 5, 1998, and the Marinette County Circuit Court, the Honorable Charles D. Heath, denied the motion, concluding that Richter's consent to the search cured any problem with the initial entry.

¶ 12. At a second hearing held on February 12, 1998, the circuit court judge reversed himself, finding that the State had failed to show any exigent circumstances justifying the warrantless entry. The court concluded that Richter's consent to the search and the subsequent discovery of the drugs flowed directly from the illegal entry and thus could not cure it. Based on the Fourth Amendment and art. I, secs. 1, 2, 9, and 11 of the Wisconsin Constitution, the court suppressed Richter's statements and the drug evidence.

¶ 13. On March 18, 1998, the circuit court judge signed findings of fact, conclusions of law and an order granting the defendant's suppression motion. This order had been submitted the previous day by Richter's attorney but had not been approved in advance by the district attorney. That same day—March 18, 1998—the district attorney submitted his own proposed findings and conclusions, together with a cover letter explaining that he had "problems with the way

---

[2] Unless otherwise noted, all references to the Wisconsin statutes are to the 1995–96 version.

[the defense attorney's proposed order] was drafted." On March 30, 1998, the circuit court judge signed and entered the district attorney's order.[3]

¶ 14. On May 11, 1998, the State filed an appeal pursuant to Wis. Stat. § 974.05(1)(d)2 and 3. The court of appeals affirmed. *Richter*, 224 Wis. 2d at 817. The court concluded that exigent circumstances did not justify the warrantless entry, rejecting the State's argument that a threat to the safety of the trailer's occupants was present. *Id.* at 821. The court of appeals also rejected the State's argument that this was a case of "hot pursuit," concluding that because Berlin did not personally observe the crime or the fleeing suspect, his actions did not constitute an " 'immediate or continuous pursuit of [a suspect] from the scene of a crime. . . .' " *Id.* at 821 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)).

¶ 15. The court of appeals also rejected the State's alternate theory that Richter's consent was sufficiently attenuated from the initial entry to be valid. *Id.* at 823. Relying on *State v. Phillips*, 218 Wis. 2d 180, 205, 577 N.W.2d 794 (1998), and *State v. Bermudez*, 221 Wis. 2d 33, 585 N.W.2d 628 (Ct. App. 1998), the court of appeals found Richter's consent to be too close in time to the entry and not adequately insulated from the initial illegality by an acceptable intervening circumstance in order for attenuation theory to apply. In particular, the court of appeals was troubled by the fact that Berlin did not tell Richter he did not have to consent to the search. *Richter*, 224 Wis. 2d at 825–26. The court also concluded that Berlin purposefully exploited

---

[3] The order prepared by the district attorney differed from the order prepared by Richter's attorney, but in ways not significant to the substantive issues presented on this review.

Richter's state of sleep in order to gain consent. *Id.* at 827.

¶ 16. The State petitioned for review. Richter filed a petition for cross review alleging that the State's notice of appeal was untimely.[4] We address Richter's cross petition first because it presents a question that bears upon our ability to reach the substantive issues in this case.

¶ 17. The State filed its notice of appeal pursuant to Wis. Stat. § 974.05(1)(d)2, which states, "[w]ithin the time period specified by s. 808.04(4) and in the manner provided for civil appeals under chs. 808 and 809, an appeal may be taken by the state from any. . .(d) Order or judgment the substantive effect of which results in:. . .2. Suppressing evidence." Wisconsin Stat. § 808.04(4) states that the relevant time period is 45 days from the entry of the judgment or order appealed from.

¶ 18. The controversy arises here because the circuit court entered two separate orders, the first on March 18, 1998, and the second on March 30, 1998, both of which accomplished the same result—the suppression of evidence—although pursuant to somewhat different findings of fact and conclusions of law. The State filed its notice of appeal on May 12, 1998, 43 days after the March 30th order, but 55 days after the March 18th order.

¶ 19. Richter argues that the time for appeal under Wis. Stat. § 974.05 began to run when the first order was entered. The first order was prepared by Richter's attorney and submitted to the circuit court by

---

[4] By order dated December 2, 1998, the court of appeals rejected Richter's claim that the State's appeal was untimely. *State v. Richter*, 224 Wis. 2d 814, 818 n.1, 592 N.W.2d 310 (Ct. App. 1999).

cover letter dated March 17, 1998. The letter indicated that a copy had been given to the district attorney for his approval and informed the judge that the district attorney "want[ed] to get it cleared by Justice in Madison." Nevertheless, the order was entered the very next day. That same day, March 18, the district attorney submitted his own proposed order, by cover letter indicating that he knew that the defense attorney had "previously submitted Findings, but I had problems with the way that was drafted." The circuit court entered the second order on March 30, 1998.

¶ 20. The court of appeals summarily concluded that the circuit court intended the second order to control and so the State's appeal was timely. We agree. Marinette County Circuit Court Rules provide for a five-day waiting period for objections to proposed orders.[5] The circuit court entered the first order in this case without waiting for the five-day objection period to expire, after having been alerted by the defense attorney who submitted it that the prosecutor wanted to consult with the attorney general's office before consenting to its entry. After being notified by the district attorney that there were, indeed, objections to the defense attorney's order, and having received without objection an alternate proposed order from the district attorney, the circuit court entered the district attorney's order.

¶ 21. Apparently then, this was a situation of competing proposed orders, received by the court

---

[5] Marinette County Circuit Court Rule 205 provides: "When counsel submits a document to the court for signature, a copy shall be simultaneously forwarded to all other counsel and/or unrepresented parties. Objections to the form or content of the document submitted shall be filed in writing with the court within 5 days of service or mailing."

within a day of each other; the first order was entered prior to the expiration of the five-day objection period, and after the court was alerted to the objection, the second order was entered, replacing the first. All of this occurred within a time frame of less than two weeks. Although the circuit court judge did not explicitly vacate the earlier order, it seems clear under the circumstances that he intended the second order to supersede the first.

¶ 22. This is not one of those situations in which a circuit court has issued successive, nonconflicting orders or judgments (for example, a memorandum decision and order, followed by an order for judgment, followed by a judgment), each purporting to resolve the entire matter, and the task is to determine which was intended as the final order for purposes of the time for appeal. *See, e.g., Radoff v. Red Owl Stores, Inc.,* 109 Wis. 2d 490, 326 N.W.2d 240 (1982); *Fredrick v. City of Janesville,* 92 Wis. 2d 685, 285 N.W.2d 655 (1979); *State v. Wright,* 143 Wis. 2d 118, 420 N.W.2d 395 (Ct. App. 1988). Instead, these were competing, nonfinal orders dealing with the suppression of evidence. The statute provides that "an appeal may be taken by the state from *any* order or judgment. . .[s]uppressing evidence." Wis. Stat. § 974.05(1)(d)2 (emphasis added). The analysis of this line of cases is therefore inapplicable.

¶ 23. Nor is this issue governed by *Ver Hagen v. Gibbons,* 55 Wis. 2d 21, 197 N.W.2d 752 (1972). *Ver Hagen* held that an appeal may not be taken from an order denying a motion for reconsideration of an earlier final order if it merely addresses the same issues as the earlier order. *Id.* at 26. Here, however, we have the serial entry of conflicting proposed findings of fact and conclusions of law regarding the suppression of evi-

dence, rather than a request for reconsideration of an earlier final order disposing of all matters in litigation. *Ver Hagen* is therefore distinguishable.

¶ 24. *Edland v. Wisconsin Physicians Service Ins. Corp.*, 210 Wis. 2d 638, 563 N.W.2d 519 (1997), is instructive, although not perfectly analogous. In *Edland* we allowed an appeal from an order of a circuit court vacating and re-entering an earlier final order which the court had failed to send to the parties. *Id.* at 641. We concluded that the circuit court's failure to give the parties notice of the entry of the initial final order constituted a "mistake" under Wis. Stat. § 806.07(1)(a), which allows relief from a judgment or order upon a showing of "mistake, inadvertence, surprise, or excusable neglect." *Id.* at 645. The circuit court's mistake had deprived the parties of notice of the entry of the original final order and therefore effectively eliminated their opportunity to timely file an appeal. *Id.* at 647. We held that this sort of mistake "constitutes a compelling equitable consideration under § 806.07(1)(a) which outweighs the goal of finality and provides a basis for effectively extending the time to appeal." *Id.* at 648. Here, by analogy, the circuit court's second order, while not specifically vacating the earlier order, corrected the apparent mistaken entry of the first, and the one supplanted the other for all purposes, including time to appeal.

¶ 25. It is important to note that there is no evidence the March 30th order was entered in an attempt to manipulate and extend the running of the appellate clock. Indeed, the second order was submitted by the district attorney on the same day the first order was entered (and apparently without knowledge that it had already been entered), and it was signed 12 days later,

538

when the State still had 33 days left to appeal from the earlier order, had it still been controlling. The second order did not resuscitate the case after the time for appeal had expired. Considerations of finality, therefore, are not seriously in play in this case. Richter cannot have reasonably expected the first order to remain controlling after the second order was entered without any objection from him. Accordingly, we conclude the March 30th order superseded the March 18th order and was controlling for all purposes, including time to appeal. The State's appeal was therefore timely filed.

¶ 26. We now turn to the substantive issue: whether Berlin's warrantless entry into Richter's trailer was justified by the exigent circumstances exception to the warrant requirement and therefore valid under the Fourth Amendment and its Wisconsin constitution counterpart. This is, of course, a mixed question of constitutional fact that we review under two different standards. *State v. Hughes*, 2000 WI 24, ¶ 15, 233 Wis. 2d 280, 607 N.W.2d 621. The trial court's findings of evidentiary or historical fact will not be overturned unless they are clearly erroneous. *State v. Martwick*, 2000 WI 5, ¶ 17, 231 Wis. 2d 801, 604 N.W.2d 552. We independently determine whether the historical or evidentiary facts establish exigent circumstances sufficient to justify the warrantless entry into the defendant's home. *State v. Secrist*, 224 Wis. 2d 201, 208, 589 N.W.2d 387 (1999).

¶ 27. The Fourth Amendment to the United States Constitution protects the rights of citizens against unreasonable searches and seizures.[6] The Wis-

---

[6] The Fourth Amendment states:

consin Constitution contains a substantively identical provision, art. I, sec. 11, that this court interprets consistently with the Fourth Amendment. *Secrist*, 224 Wis. 2d at 208.

¶ 28. A warrantless search of a home is presumptively unreasonable under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573 (1980). Indeed, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)(quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972)). However, the Fourth Amendment is not an absolute bar to warrantless, nonconsensual entries into private residences. Following United States Supreme Court precedent, we have recognized that in certain circumstances it would be unreasonable and contrary to public policy to bar law enforcement officers at the door. *State v. Smith*, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); *Warden v. Hayden*, 387 U.S. 294, 298–300 (1967). In such circumstances, we weigh the urgency of the officer's need to enter against the time needed to obtain a warrant. *Smith*, 131 Wis. 2d at 228.

¶ 29. There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee. *Id.* at 229. The State bears the burden of proving the existence of exigent circumstances. *Id.* at 228.

██

¶ 30. As in other Fourth Amendment cases, the determination of whether exigent circumstances are present turns on considerations of reasonableness, and we apply an objective test. The test is "[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape." *Id.* at 230.

¶ 31. Thus, our analysis focuses on the reasonableness of Berlin's decision to enter Richter's trailer based on the facts in his possession at the time he stood at Richter's door: a break-in across the street just moments earlier, a contemporaneous eyewitness report that the suspect had entered Richter's trailer, tell-tale signs of forced entry at the trailer, and sleeping people inside potentially at risk of harm from the intruder. The State argues that there is enough exigency here to justify the warrantless entry, because Berlin was in hot pursuit of the burglary suspect and because the safety of the people inside the trailer was in jeopardy.

¶ 32. The exigent circumstance of "hot pursuit" is established "where there is an 'immediate or continuous pursuit of [a suspect] from the scene of a crime.'" *Id.* at 232 (quoting *Welsh*, 466 U.S. at 753). The court of appeals concluded Berlin was not in hot pursuit of the burglary suspect because:

The suspected intruder had already left the lot 438 [the Champion's] trailer by the time Berlin arrived on the scene. The violation was observed by a witness, not the officer, and some period of time elapsed between the time Berlin arrived at the scene and the time he approached the trailer on lot 439. The record does not demonstrate there was immediate or continuous pursuit of the suspect from the scene of the unlawful entry.

*Richter*, 224 Wis. 2d at 821–22.

¶ 33. This analysis implies that the exigency of "hot pursuit" as a justification for a warrantless home entry requires that the officer himself personally observe the crime or the fleeing suspect. We do not believe there is such a prerequisite. The exigency of an officer's pursuit of a suspect may be just as great when the officer is told of the crime and the whereabouts of the suspect by an eyewitness just after its commission as when he observes it himself. To allow a warrantless entry when an officer personally observes a crime and pursues the suspect, but disallow it when he immediately responds to an eyewitness report 'and pursues the suspect would be arbitrary indeed.

¶ 34. We note that *Welsh* itself makes no mention of such a distinction. *Welsh* did not even reach the question because in that case, *no one* pursued the suspect from the scene of the crime or observed his flight at all. The investigating officers only determined the suspect's whereabouts by checking the motor vehicle registration of his abandoned car.

¶ 35. *Hayden* supports our conclusion that "hot pursuit" does not necessarily require that the officer personally witness the crime or the suspect's flight from the scene. In *Hayden*, the United States Supreme Court upheld a warrantless entry into the home of a

man suspected of robbing a cab company. *Hayden*, 387 U.S. at 297. Two cab drivers had followed the robber from the scene of the crime to a house. *Id.* One of the drivers notified his dispatcher of the suspect's location and the dispatcher relayed the information to the responding police officers, who entered the house. *Id.* The Court found these circumstances sufficiently exigent to justify the officers' warrantless entry. *Id.*

¶ 36. Like the officers in *Hayden*, Berlin responded to a dispatch and picked up the trail of a fleeing suspect from an eyewitness account. His response to the scene of the crime was immediate, and his pursuit of the suspect was immediate and continuous upon his arrival on the scene and rapid collection of information regarding the whereabouts of the suspect. There is no evidence in this record of any delay in Berlin's response or pursuit that would have interrupted the immediacy and continuity of the situation and therefore dissipated the exigency. We conclude that Berlin's entry was justified by the exigent circumstance of hot pursuit.

¶ 37. The State also argues that this entry was justified by the exigency of a threat to the safety of the suspect or others. It is well-established that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Hayden*, 387 U.S. at 298–99. The court of appeals concluded that there was no threat to safety here because:

> Although Berlin was responding to a dispatch of a burglary, when he arrived at the scene he learned no burglary had taken place. Rather, the incident was an attempted unlawful entry. There were no

543

> reports that firearms were present or indications
> that the suspect was known to be violent or danger-
> ous. The occupants in Richter's trailer were all
> asleep when Berlin arrived. Berlin calmly
> conversed with the two occupants he initially awoke
> prior to entering the trailer. We conclude these facts
> support the conclusion that the officer could not
> have reasonably believed a grave threat to the
> safety of others existed.

*Richter*, 224 Wis. 2d at 821. This analysis draws infer-
ences and reaches conclusions that the facts do not
support, and places too much emphasis on what was
unknown and undiscoverable—instead of what was
known and could reasonably be inferred—at the time of
the entry.

¶ 38. In fact, the record in this case does *not*
establish that Berlin learned when he arrived on the
scene that a mere attempted unlawful entry had taken
place rather than the burglary-in-progress to which he
had been dispatched. The difference between a bur-
glary and some other, less serious form of unlawful
entry lies in the intent of the perpetrator; burglary
requires intent to steal or commit a felony. *See* Wis.
Stat. § 943.10(1). Because the Champions apparently
successfully interrupted the crime, Berlin did not know
prior to entering Richter's trailer whether the intruder
he was pursuing intended to steal or commit a felony.

¶ 39. But this understandable lack of informa-
tion about *mens rea* at this early and urgent stage of
the pursuit does not establish, as the court of appeals
suggested, that this was an attempted unlawful entry
and not a burglary. Nor does it support the court of
appeals' apparent inference that the intruder was
therefore benign and not a threat to anyone. Similarly,
that the crime was not completed (because it was inter-

rupted by the victims) has no bearing on the evaluation of the threat posed by the suspect. That the suspect abandoned the crime and fled does not mean he was not potentially dangerous to those in the home into which he fled.

¶ 40. The court of appeals also emphasized the lack of information about the suspect's known dangerousness and the presence of any firearms. This expects too much and puts too much at risk. In the course of investigating crimes in progress and pursuing fleeing suspects, police officers are often called upon to make judgments based upon incomplete information. The exigency at issue here is the threat to physical safety. To require a police officer in this situation to have affirmative evidence of the presence of firearms or known violent tendencies on the part of the suspect before acting to protect the safety of others is arbitrary and unrealistic and unreasonably handicaps the officer in the performance of one of his core responsibilities. Certainly, pursuit of a suspect known to be armed and dangerous would establish exigent circumstances implicating a threat to physical safety. The absence of information about firearms or the propensities of the suspect, however, does not mean that no threat could possibly have been present.

¶ 41. Focusing on what *was* known and could reasonably be inferred by the officer at the time of the entry, we conclude that Berlin reasonably believed that the intruder he was pursuing posed a threat to the safety of the occupants of Richter's trailer. It was the middle of the night. A stranger had just broken into the Champions' trailer, but was discovered and therefore abandoned whatever crime he intended to commit inside; fleeing into Richter's trailer across the street.

545

There were obvious signs of forced entry at Richter's trailer—an open window (in 40-degree weather), and the knocked out screen lying on the ground. It was reasonable to infer from this that the suspect did not belong there but in fact had broken in, just as he did at the Champions'. There were people sleeping inside Richter's trailer at the time the intruder entered, creating a situation fraught with potential for physical harm if something was not immediately done to apprehend the suspect.[7]

¶ 42. The court of appeals' assertion that two of the people inside "calmly conversed" with the officer is not supported by the record, which contains no information about their demeanor or state of mind. Nor would such a conclusion, if factually supported, necessarily establish that they were not at risk. In a situation such as this, involving an unknown male intruder who forcibly entered not one but two occupied homes in the middle of the night, a reasonable officer would be completely warranted in the belief that a threat to safety existed.

¶ 43. In hindsight, there apparently was no threat to those inside Richter's trailer, because the intruder was in fact a resident there. But we do not apply hindsight to the exigency analysis; we consider only the circumstances known to the officer at the time he made the entry and evaluate the reasonableness of the officer's action in light of those circumstances. *Smith*, 131 Wis. 2d at 230. In this regard, the United States Supreme Court has said:

---

[7] In any break-in situation involving an occupied home there is potential for harm to the intruder as well as the occupants of the home.

It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

*Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).

¶ 44. Because we have concluded that Berlin's entry into Richter's home was reasonable and justified by exigent circumstances, we need not address the attenuation theory advanced by the State as an alternate basis upon which to uphold this search. However, we agree with the State that the court of appeals misapplied the attenuation doctrine and so for purposes of clarification briefly address it.

¶ 45. Illegal conduct by law enforcement may taint a homeowner's subsequent consent to search. *Brown v. Illinois*, 422 U.S. 590, 603 (1975); *State v. Phillips*, 218 Wis. 2d at 205; *State v. Anderson*, 165 Wis. 2d 441, 448, 477 N.W.2d 277 (1991). In *Phillips*, we applied the test established in *Brown* for determining whether consent to search obtained after an illegal entry is sufficiently attenuated from an illegal entry in order to purge the taint. *Phillips*, 218 Wis. 2d at 205–12. The test requires the evaluation of three factors: 1) the temporal proximity of the official misconduct and seizure of evidence, 2) the presence of intervening circumstances, and 3) the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at

603–04; Phillips, 218 Wis. 2d at 205; *Anderson*, 165 Wis. 2d at 448.

¶ 46. The court of appeals found the first of the attenuation factors—the temporal proximity of the entry and the seizure of the evidence—to weigh against attenuation, since Berlin's entry into the trailer was followed almost immediately by Richter's consent and the search. *Richter*, 224 Wis. 2d at 824. We do not disagree with this part of the analysis. But in *Phillips* we held that the evaluation of the timing of the search vis-à-vis the entry must also consider the conditions existing at the time of the consent. *Phillips*, 218 Wis. 2d at 206. In that case, we held that even when temporal proximity is very close, "the non-threatening, non-custodial conditions surrounding the search. . .lean toward a finding that any taint created by the agents' unlawful entry. . .dissipated when the defendant consented to the search." *Id.* at 207.

¶ 47. Here, the court of appeals concluded that the following conditions aggravated an otherwise concededly non-threatening, non-custodial situation: 1) Berlin was armed (even though he did not draw his gun), and 2) Richter was awakened from a deep sleep. *Richter*, 224 Wis. 2d at 825. We disagree that these particular conditions are sufficiently aggravating to transform this non-threatening, non-custodial situation into one which weighs against attenuation.

¶ 48. More importantly, however, the court of appeals' evaluation of the second and third factors in the attenuation analysis suggests certain doctrinal requirements that do not actually exist. In its analysis of the second factor—the presence of intervening circumstances between the initial entry and the defendant's consent—the court of appeals seemed to suggest, based upon *Phillips* and *Bermudez*, that inter-

vening circumstances for purposes of attenuation cannot be found to exist where the officer fails to inform the subject of the search that he does not have a warrant and that consent to search need not be given. *Richter*, 224 Wis. 2d at 825–26. This is incorrect.

¶ 49. In *Phillips* we were persuaded that intervening circumstances were sufficiently present to support attenuation because, among other things, the officers informed the defendant that they did not have a warrant. *Phillips*, 218 Wis. 2d at 209. In *Bermudez* the court of appeals was persuaded that intervening circumstances were not sufficiently present to support attenuation, but this was, because of what the court characterized as "the totality of the circumstances surrounding the police misconduct" in the case. *Bermudez*, 221 Wis. 2d at 355, 358. It was *not*, as suggested by the court of appeals here, "because the officers failed to inform the defendant's wife that they did not have a search warrant or that she did not have to consent to the search." *Richter*, 224 Wis. 2d at 826.

¶ 50. Neither *Phillips* nor *Bermudez*, nor the cases read together, stand for the proposition that an officer *must* tell the subject of a search that he has the right to refuse consent or that the officer has no warrant in order to satisfy the test for attenuation. The absence of such a conversation in this case is not fatal to a finding of attenuation. In *Phillips* we emphasized that a conversation between the officer and the subject of the search may be a significant intervening circumstance if "it provided the [subject] with sufficient information with which he could decide whether to freely consent to the search. . . ." *Phillips*, 218 Wis. 2d at 208–09. The information that suffices will vary from case to case.

549

¶ 51. Here, Berlin told Richter that an intruder had broken into the trailer across the street, that the intruder had been seen entering Richter's trailer, and that he wanted to search the trailer for the intruder. It was clear from the conversation, however brief and hard on the heels of the entry, that Richter was not the target of the search. We conclude that this information was sufficient to allow Richter to freely consent to the search.

¶ 52. The third factor in the attenuation analysis is the purpose and flagrancy of the official conduct. *Id.* at 209. Applying the test from *Phillips*, the court of appeals stated:

> Conduct which may not be flagrant may still be sufficiently purposeful so as to be proscribed under the attenuation analysis. *The purpose of Berlin's entry was to follow a lead that an unidentified suspect had attempted to enter another trailer and then apparently run into Richter's trailer.* From his position outside the window, Berlin could see Richter asleep on the sofa. Berlin nevertheless entered the trailer unannounced sometime after 4:30 a.m. and awoke Richter to ask permission to search for an intruder. He did not attempt to awaken Richter from outside the trailer either by shining his flashlight at Richter, as he did the other two occupants, or by knocking on the door. He did not ask the already awakened occupants in the trailer to awaken Richter. These circumstances give the appearance of exploiting Richter's state of sleep in order to gain entry. Therefore, we conclude that Berlin's conduct displays the necessary level of purposefulness which is proscribed under the attenuation analysis.

*Richter*, 224 Wis. 2d at 826–27 (emphasis added).

¶ 53. We have held that this third factor in the attenuation analysis is " 'particularly' important" because it is most closely tied to the rationale of the exclusionary rule—to discourage police misconduct. *Phillips*, 218 Wis. 2d at 209 (citing *Brown*, 422 U.S. at 604, and *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990)). "[A]pplication of the [exclusionary rule] does not serve this deterrent function when police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *Phillips*, 218 Wis. 2d at 209 (quoting *Fazio*, 914 F.2d at 958). Thus inherent in the flagrancy or purposefulness evaluation is an inquiry into whether there is evidence of some degree of bad faith exploitation of the situation on the part of the officer.

¶ 54. Here—unlike either *Phillips* or *Bermudez*—Richter was not the target of the officer's investigation or search. The officer was pursuing a fleeing burglar, not investigating a drug crime. There is simply no evidence in this record to suggest that Berlin entered Richter's home with ulterior motives, to undermine Richter's rights, to pressure him to consent, or to otherwise exploit the situation in hopes of finding evidence *against Richter*. So, while Berlin's conduct was of course "purposeful"—he was trying to gain entry and consent to search—the purpose was directed at apprehending a burglary suspect, not getting the goods on Richter. This is not the sort of "purposefulness" that defeats attenuation.

¶ 55. Accordingly, we conclude that the warrantless entry of the defendant's home was justified based on the exigent circumstances of hot pursuit and threat

to safety and was therefore reasonable under the Fourth Amendment and its Wisconsin counterpart. We also conclude that even if Berlin's entry had been contrary to the Fourth Amendment, Richter's consent was sufficiently attenuated from the entry to purge any taint of illegality.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 56. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. I agree with the circuit court and court of appeals, both of which held that the evidence in this case should be suppressed. The majority opinion, on the other hand, criticizes the court of appeals, contending that it "draws inferences and reaches conclusions that the facts do not support. . . ." Majority op. at ¶ 37. I believe this very same criticism can be leveled at the majority opinion.

¶ 57. A "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."[1] A warrantless search of a home is presumptively unreasonable. Majority op. at ¶ 28. Therefore the burden is on the State to prove the existence of circumstances permitting entry into a home without a warrant. Majority op. at ¶ 29. The State clearly has not met its burden in this case.

¶ 58. The majority opinion infers that the intruder's entry into trailer #439 was by forced entry through a window. According to the complaint, however, Brian Champion said that when the intruder left the Champion trailer (#438) the intruder "went in the

---

[1] *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984), quoting *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972).

front door [of trailer #439]." According to the officer's testimony at the suppression hearing, witnesses reported only that the intruder entered trailer #439. The officer inferred that the intruder entered trailer #439 through an open window. The officer shone his flashlight through the open window, exposing four adults asleep in the room in which the intruder was supposed to have entered. The officer had no reports of physical violence, threats or weapons. These facts are insufficient to support an officer's reasonable belief "that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape."[2]

¶ 59. I agree with the court of appeals that the officer was not in hot pursuit of a suspect because "[t]he record does not demonstrate there was immediate or continuous pursuit of the suspect from the scene of the unlawful entry." *State v. Richter*, 224 Wis. 2d 814, 821–22, 592 N.W.2d 310 (Ct. App. 1999). In *Welsh v. Wisconsin*, 466 U.S. 740 (1984), in which the police entered the defendant's home only minutes after a witness observed the defendant fleeing from his car, the U.S. Supreme Court held that "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of the [defendant] from the scene of a crime."[3] Furthermore, a number of courts have concluded that hot pursuit must be accompanied by a credible threat of violence in order to justify a warrantless entry.[4]

---

[2] *State v. Smith*, 131 Wis. 2d 220, 230, 388 N.W.2d 601 (1986).

[3] 466 U.S. 740, 753 (1984).

[4] *See, e.g., State v. Bolte*, 560 A.2d 644, 654 (N.J. 1989) (hot pursuit alone is an insufficient justification for a warrantless entry into home); *Butler v. State*, 829 S.W.2d 412, 415 (Ark.

¶ 60. I agree with the circuit court and court of appeals that no exigent circumstances justify this warrantless search. The circuit court stated:

> I really don't think that constitutes exigent circumstances. I really don't. The officer could have stood outside and knocked on the door. He's searching for someone that a citizen says ran that way. . . .
>
> Clearly the officer is there illegally because he doesn't have permission. I don't think there are exigent circumstances. I don't think there is hot pursuit. As I indicated, the officer could have very well knocked on the door and—on the outside, explained why he was there, instead of gaining access without permission.

¶ 61. I agree with the circuit court and court of appeals that the warrantless search was unconstitutional.

¶ 62. But after deciding the entry *was* constitutional, the majority opinion unnecessarily concludes that even if the officer's warrantless entry into the defendant's home was not constitutional, the suppres-

---

1992) (hot pursuit alone is an insufficient justification for warrantless entry into home; exigent circumstances required for disorderly conduct); *City of Seattle v. Altschuler*, 766 P.2d 518, 520–21 (Wash. Ct. App. 1989) (hot pursuit alone is an insufficient justification for warrantless entry into home; exigent circumstances required unless fleeing felon); *State v. Bowe*, 557 N.E.2d 139, 141 (Ohio Ct. App. 1988) (hot pursuit is an insufficient justification for warrantless entry into home unless violent crime involved; burglary without violence not sufficient); *People v. Sanders*, 374 N.E. 2d 1315 (Ill. App. 1978) (exigent circumstances required for warrantless entry in home; burglary without weapons not grave enough offense to justify warrantless entry; cited in *Welsh v. Wisconsin*, 466 U.S. 749, 752 (1984)).

sion motion must nevertheless be denied because the defendant's consent to search the trailer was sufficiently attenuated from the illegal entry to remove the "taint" of the illegality.

¶ 63. I disagree. I conclude that the officer's warrantless, middle-of-the-night entry, awakening of the defendant and failure to conduct an adequate investigation all weigh against a finding of attenuation.[5] The officer entered the defendant's trailer, shook the defendant awake, told him that a burglar had been seen entering his trailer and asked for consent to search the trailer. In the officer's own words at the suppression hearing, "He [the defendant] was sleeping. . . .I had to shake him and woke him up. . . ."

¶ 64. The majority relies on this "brief conversation" to support a finding of attenuation. The majority opinion's finding of attenuation in this case is inconsis-

---

[5] Contrary to the majority's suggestion, our prior cases hold that a warning to the defendant that the officer does not have a warrant, while perhaps not necessary, contributes to a finding of attenuation. *See State v. Phillips*, 218 Wis. 2d 180, 208–09, 577 N.W.2d 794 (1998) (explaining to defendant that the police lacked a warrant supports finding of attenuation); *State v. Anderson*, 165 Wis. 2d 441, 448, 477 N.W.2d 277 (1991) (reading Miranda warnings to defendant and signed waiver support finding of attenuation for statement and search); *State v. Bermudez*, 221 Wis. 2d 338, 358, 585 N.W.2d 628 (Ct. App. 1998) (failing to inform defendant of no warrant and no need to consent weighs against finding of attenuation); *United States v. Recalde*, 761 F.2d 1448, 1458–59 (10th Cir. 1985) (reading Miranda warnings and advising defendant of right to refuse consent are factors that may satisfy "the requirement of intervening circumstances").

tent with other cases and risks making a mockery of the attenuation doctrine.[6]

¶ 65. This case is, unfortunately, just one more in a line of recent cases in which the court has not been sufficiently protective of the privacy of the home.[7] For the reasons set forth above, I dissent.

¶ 66. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

[6] *See, e.g., United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997) (no attenuation where consent to search "followed almost immediately after the illegal seizure" and "no intervening event of any significance occurred between the illegal seizure and the consent to break the causal chain"); *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996) (for attenuation a discontinuity between the illegal stop and the consent must occur).

[7] *See, e.g., State v. Welsh*, 108 Wis. 2d 319, 321 N.W.2d 245 (1982), rev'd *Welsh v. Wisconsin*, 466 U.S. 740 (1984) (U.S. Supreme Court reversed our court decision that held law-enforcement officer may enter home to arrest driver suspected of driving under the influence of intoxicants, a noncriminal offense); *State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994), *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996), and *Richards v. Wisconsin*, 520 U.S. 385 (1997) (U.S. Supreme Court concluded that our court erred in adopting a categorical rule holding that a no-knock entry is permissible when officers have a warrant to search the home of a suspected felony drug dealer); *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517 (our court held a search warrant valid despite failure to link illegal drugs to accused's residence); *State v. Martwick*, 2000 WI 5, 231 Wis. 2d 801, 604 N.W.2d 552 (our court curtailed curtilage); *State v. Hughes*, 2000 WI 24, 233 Wis. 2d 280, 607 N.W.2d 621 (our court held that odor of marijuana justified warrantless entry).